IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS

Duane Page (N-40950),　　　　　　　　)
　　　　　　　　　　　　　　　　　　)
　　　　　Plaintiff,　　　　　　　　　)
　　　　　　　　　　　　　　　　　　)　Case No. 15 C 7411
　　　v.　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　)　Judge Elaine E. Bucklo
Ghaliah Obaisi, Independent Executor of　)
the Estate of Saleh Obaisi, et al.,　　　　)
　　　　　　　　　　　　　　　　　　)
　　　　　Defendants.　　　　　　　　)

## MEMORANDUM OPINION AND ORDER

In this *pro se* civil rights action pursuant to 42 U.S.C. § 1983, Duane Page, a prisoner in state custody, challenges treatment provided for a hand injury he sustained while playing basketball. Defendants Ghaliah Obaisi, Independent Executor of the Estate of Saleh Obaisi, Physician's Assistant LaTanya Williams, and Wexford Health Sources move for summary judgment. For the following reasons, Defendants' motion is granted.

## BACKGROUND

### I.　Northern District of Illinois Local Rule 56.1

Page is proceeding *pro se*.[1] Defendants thus served him with a "Notice to Pro Se Litigant Opposing Motion for Summary Judgment" (Dkt. 90) that explains how to respond properly to a motion for summary judgment and statement of material facts under Federal Rule of Civil Procedure 56 and Local Rule 56.1. Under the Court's Local Rules, a moving party must provide "a statement of material facts as to which [it] contends there is no genuine issue." *Cracco v. Vitran*

---

[1] In early 2016, before any Defendants had been served, Page asked the Court to recruit counsel to represent him. Dkt. 8. The Court denied the motion without prejudice as premature. Dkt. 14. In May 2017, Page advised the magistrate judge, who was supervising discovery, that he was attempting to retain counsel. Dkt. 61. The magistrate judge told Page that if he wanted to renew his request for attorney assistance, he should file a motion with the assigned District Judge. *Id*. Page did not do so.

*Exp., Inc.*, 559 F.3d 625, 632 (7th Cir. 2009). "The opposing party is required to file 'a response to each numbered paragraph in the moving party's statement, including, in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon.'" *Id.* (citing N.D. Ill. R. 56.1(b)(3)(B)).

In response to Defendants' statement of facts, Page filed a comprehensive 31-page document entitled "Plaintiff's LR 56.1(b) Statement of Material Facts" that contains 47 paragraphs (not including subparagraphs) and attaches 249 pages of exhibits. (Dkt. 99). Because Page is proceeding *pro se*, the Court has interpreted his response generously and will construe it as favorably as the record and Local Rule 56.1 permit, to the extent that he has pointed to admissible evidence in the record that corresponds to Defendants' facts or could properly testify himself about the matters asserted. *See Hanners v. Trent*, 674 F.3d 683, 691 (7th Cir. 2012); *Sistrunk v. Khan*, 931 F. Supp. 2d 849, 854 (N.D. Ill. 2013); Fed. R. Evid. 602. With this in mind, the court turns to the parties' Rule 56.1 submissions.

## II. Facts

State prisoner Duane Page is incarcerated at the Stateville Correctional Center. Defs.' SOF, ¶ 1. Defendant LaTanya Williams is a physician's assistant who works at Stateville Correctional Center. *Id.*, ¶ 2. Dr. Saleh Obaisi, who is deceased, was Stateville's Medical Director at the relevant time. *Id.*, ¶ 3. Ghaliah Obaisi, Independent Executor of the Estate of Saleh Obaisi, has been substituted for Dr. Obaisi. Dkt. 117.

On September 3, 2014, Page (who was forty-eight years old at the time) injured his right hand when he fell while playing basketball and used his hand to brace himself. Defs.' SOF, ¶ 7. Following his fall, Page told Certified Medical Technician Barnes that his right wrist was painful.

*Id.*, ¶ 8. Barnes noted a need to rule out wrist fracture, applied ice, and had Page transported to the prison's Health Care Unit ("HCU") for evaluation. *Id.* Physician's Assistant LaTanya Williams evaluated Page after he arrived at the HCU. *Id.*, ¶ 9. Page complained of a right wrist that was tender to palpation with decreased range of motion and strength but with sensation intact. *Id.* Williams determined that Page needed to be evaluated for a potential fracture, ordered an x-ray of the right hand/wrist, and told Page to return to the HCU after the x-ray had been taken. *Id.* She also provided a Toradol injection for pain, ordered an arm sling and ice, and prescribed Motrin for pain and inflammation. *Id.*

Page received an x-ray the next day, September 4, 2014. *Id.*, ¶ 10. Dr. Leef (a radiologist) interpreted the x-ray as showing oblique fractures in good position of the shafts of the third and fourth metacarpals (bones in the palm of the hand). *Id.* Based on these results, staff physician Dr. Martija ordered Page to be sent to the emergency room at Presence St. Joseph Hospital for evaluation and management of a fracture and an orthopedic consult. *Id.*, ¶ 11. At the emergency room, medical staff recommended a splint, gave one to Page, and advised him to ice and elevate the affected area, take pain medication as necessary, and follow up with an orthopedist or hand doctor. *Id.*, ¶ 12. A nurse contacted Dr. Obaisi, who ordered Motrin for pain relief, as well as a temporary low bunk permit. *Id.*, ¶ 13.

Page's medical records show that as of September 12, 2014, he was waiting for an outside appointment, and that he was scheduled to see a Wexford physician on September 15, 2014. *Id.* On September 15, 2014, Dr. Obaisi obtained Wexford's approval, via collegial review, of an external orthopedic evaluation for Page. *Id.*, ¶ 14. Security staff could not bring Page for his internal

September 15, 2014 appointment due to a level 4 lockdown so the appointment was rescheduled to September 22, 2014. *Id*.

In the meantime, Page had an appointment with Dr. Obaisi on September 16, 2014; this was the first time Dr. Obaisi saw Page's hand injury. *Id*., ¶ 15. At that time, Page was wearing a soft cast. *Id*. Dr. Obaisi told Page to continue to wear the soft cast and requested a follow-up visit in two weeks to evaluate the fractures to the third and fourth metacarpals. *Id*. On September 16, 2014, Wexford staff emailed an appointment request for an outpatient visit with the orthopedics department at University of Illinois Hospital ("UIC"). *Id*. Page argues that Dr. Obaisi did not follow up to ensure that he was able to attend the outside appointment.[2] *Id*., ¶ 14. Page had been scheduled for another appointment with Dr. Obaisi on September 22, 2014, but on that date, security staff was again unable to bring him to his appointment due to another level 4 lockdown.[3] *Id*., ¶ 17.

On September 23, 2014, there was an institutional shakedown at Stateville. *Id*., ¶ 18. According to Page, during the shakedown, correctional officers removed his soft cast, threw it out,

---

[2] In support, Page directs the Court's attention to a report prepared by a Court-appointed expert in *Lippert v. Godinez*, Case No. 10 C 4603 (N.D. Ill.). Dkt. 99, Ex. 18. He appears to be asserting that the expert's conclusion in *Lippert* that certain prisoners did not receive follow up care shows that he did not receive follow up care after his basketball accident. For the purposes of summary judgment, the report is inadmissible hearsay. *See Mathis v. Carter*, No. 13 C 8024, 2017 WL 56631, at *5 (N.D. Ill. Jan. 5, 2017). The Court adds that, in any event, the experiences of other prisoners have no bearing on Dr. Obaisi's actions with respect to Page's treatment. *See Williams v. Godinez*, No. 13 C 8797, 2016 WL 4945016, at *11 (N.D. Ill. Sept. 16, 2016) (rejecting prisoner's reliance on the *Lippert* report because even if it was admissible, the prisoner's claim rested on allegedly deficient care provided by Dr. Obaisi).

[3] Page takes issue with the missed appointment on September 22, 2014, asserting that the level 4 lockdown did not affect the ability of prisoners to attend medical appointments. As he provides no evidentiary support, the Court will not accept his contention that he could have seen Dr. Obaisi on September 22, 2014.

and cuffed his hands behind his back. *Id*. Later that same day, Page told a correctional medical technician that security staff had taken his soft cast. *Id*., ¶ 19. This information was transmitted to Williams, who consulted with Dr. Obaisi, who ordered another x-ray of Page's right hand and directed staff to apply another cast. *Id*.; Dkt. 99, ¶ 19. Williams ordered Page to return to the HCU to see Dr. Obaisi after his x-ray; Page insists that she did not "immediately" apply another cast. *Id*.

Page had the follow up x-ray on September 24, 2014. Dkt. 86, ¶ 20. The radiologist, Dr. Leef, interpreted the x-ray and opined that the oblique fractures to the third and fourth metacarpals were "in good position." *Id*. Dr. Obaisi saw Page later that day and noted the x-ray showed no displacement. *Id*. During that appointment, Dr. Obaisi examined Page and noted that Page was able to move his fingers and wrist well.[4] Dkt. 86, ¶ 20. Dr. Obaisi had a fiberglass splint made with Page's hand and wrist fixed in it and requested a follow-up appointment in two weeks. *Id*.

Page's sister retained Dr. Chen (an outside doctor recommended by the emergency room doctors who saw Page immediately after his accident), who subsequently reviewed the September 24, 2014 x-ray. According to Dr. Chen, that x-ray showed "[m]iminal displacement." Dkt. 99, Ex. 16, pg. 139. In his declaration, however, Page asserts that Dr. Chen told his sister that the

---

[4] Page has submitted a declaration that, at least in part, contradicts his medical records. For example, in response to Dr. Obaisi's notes for the September 24, 2014 appointment indicating that Page could move his fingers and wrist well, Page asserts that during this appointment, he could not move his two middle fingers. Dkt. 99, ¶ 20. Any contention that the Court should ignore objective medical evidence because Dr. Obaisi purportedly wrote down inaccurate information during Page's appointments is conclusory and thus insufficient to create a material issue of disputed fact. *See Davis v. Gee*, No. 14-CV-617-WMC, 2017 WL 2880869, at *5 (W.D. Wis. July 6, 2017) (citing *Scott v. Harris*, 550 U.S. 372, 380 (2007)). In any event, Page's position regarding his inability to move two of his fingers less than two weeks after his basketball accident is not enough to create a triable issue as to deliberate indifference as the Court must "look at the totality of an inmate's medical care when considering whether that care evidences deliberate indifference to serious medical needs." *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016) (en banc).

metacarpals had been "shoved backwards" in a manner that caused "severe permanent damage." Dkt. 99, Ex. 19, ¶ 42.

On September 30, 2014, Williams refilled Page's prescription for Motrin based on a message she received from him stating that he had run out of pain medication. Dkt. 86, ¶ 21. This was Williams' last interaction with Page about his hand injury. *Id.*, ¶ 22.

On October 1, 2014, Page had an appointment with Dr. Obaisi to track the progress of the fractures to his right hand. *Id.*, ¶ 23. Page's soft splint and a wrap were in place. *Id.* To monitor healing of the fractures, Dr. Obaisi requested another x-ray to the right hand in 10 days with another follow-up in two weeks. *Id.* Due to a series of lockdowns, Page returned to see Dr. Obaisi on October 27, 2014. *Id.*, ¶ 24. The requested x-ray had not been completed. *Id.* There were no acute findings, and the splint remained in place. *Id.* Dr. Obaisi again ordered an x-ray of the right hand and requested follow-up in one week. *Id.*

The requested x-ray of the right hand took place on October 29, 2014. *Id.*, ¶ 25. Dr. Leef interpreted the x-ray as showing "relative early callus at healing fractures of shafts of 3, 4 metacarpals with some angulation at the base of 4th metacarpal." *Id.*, citing Dkt. 86-4 at S414. Page returned to see Dr. Obaisi on November 10, 2014. *Id.*, ¶ 26. During this appointment, Dr. Obaisi evaluated the condition of his right hand and his dysphagia (difficulty swallowing). Dr. Obaisi opined that Page's hand was continuing to heal and ordered follow up as necessary. *Id.* Page saw a medical technician on December 22, 2014, and complained about pain and numbness at the fracture site; based on this information, he was scheduled for a follow up with Dr. Obaisi on January 13, 2014. Dkt. 99, Ex. 10, pg. 61.

Page returned to see Dr. Obaisi on January 13, 2015, complaining of discomfort in his right

hand and stiffness with movement of the third and fourth fingers. Defs.' SOF ¶ 27. Dr. Obaisi assessed Page with a healed fracture to the right hand, discontinued the right hand splint, requested an x-ray of the right hand, and referred Page to physical therapy to assist with his reported stiffness and discomfort. *Id*.

On January 15, 2015, Page underwent the x-ray that Dr. Obaisi had ordered. *Id.*, ¶ 28. Dr. Leef interpreted the imaging as showing "early healing in satisfactory position." *Id*. Page returned to see Dr. Obaisi on January 26, 2015; Dr. Obaisi ordered another x-ray of Page's right hand and a gastroenterology consultation for Page's dysphagia. *Id.*, ¶ 29. On January 30, 2015, Dr. Leef interpreted Page's x-ray as showing healing in satisfactory position. *Id.*, ¶ 30. Page correctly notes that at this time, the fracture had not completely healed. Dkt. 99, ¶ 30.

On January 30, 2015, physical therapist Jose Becerra conducted an initial evaluation for the course of physical therapy ordered by Dr. Obaisi. Defs.' SOF ¶ 31. Becerra assessed Page's active range of motion at 40-50 degrees and passive range of motion at 90 degrees, with a grip strength of 3+/5. Becerra determined that Page could perform all his activities of daily living and planned for physical therapy one to two times per week for eight to twelve weeks. *Id*. Page completed his course of physical therapy on March 17, 2015. *Id.*, ¶ 32. While Page complained that his hand was still painful when he used it too much, Becerra believed Page's right hand was "much improved" and advised him to continue with a home exercise program. *Id*.

Page returned to see Dr. Obaisi on April 9, 2015, with a complaint of occasional swelling in his right hand that was not present that day. *Id.*, ¶ 33. Although objectively there were no acute findings, Dr. Obaisi requested another x-ray of the right hand because physical therapist Becerra's notes indicated he believed it might be helpful. *Id*. Page underwent the requested x-ray on April

7

13, 2015, and Dr. Leef interpreted the imaging as demonstrating healing in good position with no new pathology. *Id.*, ¶ 34.

Page has not returned to see Dr. Obaisi in reference to any further problems with his right hand and has not related any complaints to Dr. Obaisi concerning his right hand since April 9, 2015. *Id.*, ¶ 35. However, on July 15, 2015, Page saw Nurse Lydia Diaz during sick call and reported pain in his right hand caused by opening a box lid two days earlier and soreness when he made a fist. *Id.*, ¶ 36. Nurse Diaz observed that Page had normal flexion and extension, no swelling, and full range of motion in the right hand. *Id.* She dispensed ibuprofen, instructed Page to use hot/cold packs (which he says he did not receive), and told Page to elevate his hand and avoid lifting, sports, and strenuous activity until he was pain free for two weeks. *Id.* This was the final treatment provided for Page's hand injury.

Page's medical records reflect that Dr. Obaisi referred Page for off-site treatment both before and after the hand fractures. *Id.*, ¶ 38. Specifically, pursuant to Dr. Obaisi's referrals, Page received outpatient care at UIC on July 30, 2014 (gastroenterology consultation for dysphagia), January 14, 2015 (video swallow testing), February 18, 2015 (esophagogastroduodenoscopy and colonoscopy), January 25, 2016 (a follow-up gastroenterologist appointment), February 16, 2016 (esophageal manometry testing), March 28, 2016 (gastroenterology follow-up post-manometry), May 24, 2016 (visual field testing), and July 1, 2016 (esophageal dilation procedure to address Page's dysphagia). *Id.*, ¶ 39.

## ANALYSIS

Dr. Obaisi asserts that although he initially sought an orthopedic referral immediately after Page's accident, the orthopedic service did not schedule an appointment for Page. Page's hand was

splinted and stabilized, and after a series of x-rays ultimately demonstrated appropriate healing, Dr. Obaisi decided that an orthopedic consult was unnecessary and ordered physical therapy to help Page improve the functioning of his right hand. In contrast, the gist of Page's submissions is that he disagrees with Dr. Obaisi's treatment, as well as Dr. Obaisi's opinions regarding his progress. Page also challenges care provided by Physician's Assistant Williams and contends that Wexford had a policy of providing inappropriate care designed to save money. For the following reasons, Defendants are entitled to summary judgment.

## I. Legal Standard

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party moving for summary judgment bears the burden of proving the absence of such a dispute. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). All facts and reasonable inferences are construed in the light most favorable to the nonmoving party. *Chaib v. Geo Grp., Inc.*, 819 F.3d 337, 341 (7th Cir. 2016).

## II. Page's Eighth Amendment Claims

### A. Dr. Obaisi and Physician's Assistant Williams

Under the Eighth Amendment, correctional officials are liable "if they are deliberately indifferent to a prisoner's serious medical needs." *Harper v. Santos*, 847 F.3d 923, 927 (7th Cir. 2017) (citing *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). The parties agree that a fracture qualifies as a serious medical need, and focus on the subjective element (*i.e.*, whether Physician's

9

Assistant Williams and Dr. Obaisi were deliberately indifferent). It is undisputed that Page received medical attention, albeit not to his satisfaction. Inmates are not entitled to "unqualified access to healthcare," *Holloway v. Delaware Cty. Sheriff*, 700 F.3d 1063, 1073 (7th Cir. 2012), or the best care possible, *Arnett v. Webster*, 658 F.3d 742, 754 (7th Cir. 2011). Neither medical malpractice, nor negligence, nor even gross negligence rise to the requisite culpable state of mind for deliberate indifference, which is akin to criminal recklessness. *See, e.g., Cesal v. Moats*, 851 F.3d 714, 725 (7th Cir. 2017); *King v. Kramer*, 680 F.3d 1013, 1018 (7th Cir. 2012).

Thus, a prison medical provider is not deliberately indifferent simply because he offers a different course of treatment than the one requested by the inmate. *Berry v. Peterman,* 604 F.3d 435, 441 (7th Cir. 2010). Nevertheless, "[t]he receipt of some medical care does not automatically defeat a claim of deliberate indifference," which still lies if a "prison official, having knowledge of a significant risk to inmate health or safety, administers blatantly inappropriate medical treatment, acts in a manner contrary to the recommendation of specialists, or delays a prisoner's treatment for non-medical reasons, thereby exacerbating his pain and suffering." *Perez v. Fenoglio*, 792 F.3d 768, 777 (7th Cir. 2015) (internal quotations and citations omitted). This is the crux of Page's position as he stresses that the emergency room staffers who initially evaluated his hand opined that he should follow up with an orthopedist or hand doctor. He thus asserts that Williams and Dr. Obaisi were constitutionally required to arrange this treatment and that the care they provided was inadequate.

Even when construed liberally, however, Page's arguments do not create a triable issue of fact as to deliberate indifference. First, Page criticizes Williams for the one-day delay in obtaining an x-ray after his fall. Williams evaluated Page, assessed him with a sprain that needed to be

evaluated as a potential fracture, ordered an x-ray, gave him a Toradol injection for pain, ordered an arm sling and ice, and prescribed Motrin. He received an x-ray the following day. This very modest delay after Page's condition was stabilized is consistent with the realities of scheduling medical appointments, both in the correctional context and for private citizens. *See Petties*, 836 F.3d at 730 (noting that "delays are common in the prison setting with limited resources, and whether the length of a delay is tolerable depends on the seriousness of the condition and the ease of providing treatment.").

Second, Page invites the Court to find that because Dr. Obaisi is not an orthopedic doctor, he was not qualified to make medical decisions about Page's fractured metacarpals. This is not enough to create a fact question as to whether Dr. Obaisi was medically capable of treating Page's hand. *See Brown v. Felten*, No. 15-CV-1191-PP, 2017 WL 3381225, at *6 (E.D. Wis. Aug. 4, 2017) (holding that a pro se prisoner's "conclusory assertion" that a psychiatric nurse was not qualified to prescribe psychiatric medication was not enough to survive summary judgment).

Relatedly, it is well established that medical professionals may choose from "a range of acceptable courses based on prevailing standards in the field." *Jackson v. Kotter,* 541 F.3d 688, 697 (7th Cir. 2008). Thus, "[a] medical professional is entitled to deference in treatment decisions unless 'no minimally competent professional would have so responded under those circumstances.'" *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014) (quoting *Sain v. Wood,* 512 F.3d 886, 894-95 (7th Cir. 2008)). Moreover, "[t]he federal courts will not interfere with a doctor's decision to pursue a particular course of treatment unless that decision represents so significant a departure from accepted professional standards or practices that it calls into question whether the doctor actually was exercising his professional judgment." *Id*. This means that "[d]isagreement

11

between a prisoner and his doctor, or even between two medical professionals, about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation." *Pyles*, 771 F.3d at 409.

Here, Page's first x-ray was on September 4, 2014. Dr. Obaisi was contacted; knowing that Page had been splinted and stabilized, he ordered Motrin and a lower bunk permit and requested an orthopedic evaluation that was approved September 15, 2014. In the meantime, Dr. Obaisi saw Page on September 16, 2014, told Page to continue to wear his soft cast, and ordered a follow up visit in two weeks, and Wexford staff emailed a request for an outside orthopedic consult. Lockdowns caused scheduling conflicts with appointments, but Page was consistently rescheduled as necessary. When Page's soft cast was removed during a shakedown, Williams was notified and responded by contacting Dr. Obaisi and ordering another x-ray. Page received the x-ray the following day and was slotted in to see Dr. Obaisi afterwards. Dr. Obaisi examined him, provided another cast, and scheduled a follow up appointment. Dr. Obaisi saw Page again on October 1, 2014, and scheduled another x-ray and follow up appointment.[5] When the x-ray was canceled due to a lockdown, Dr. Obaisi rescheduled it and requested another appointment. Page was again x-rayed on October 29, 2014, and saw Dr. Obaisi on November 10, 2014, and then saw Dr. Obaisi on January 13, 2015, after complaining about pain to a medical technician; Dr. Obaisi ordered another x-ray and physical therapy.

---

[5] The Court acknowledges that in response to medical records indicating that Dr. Obaisi ordered an x-ray on October 1, 2014, to monitor healing of Page's fractures, Defs.' SOF ¶ 23, Page asserts, "The broken bones were 'not healing' at this point, and remained broken." Dkt. 99, ¶ 23. This does not suggest a disputed material issue of fact because it is undisputed that as of October 1, less than a month after Page's accident, his hand was still healing. To the extent that Plaintiff intends to suggest that healing could or should have progressed more quickly, he is unqualified to offer such an opinion, which has no other record support. *See Davis*, 2017 WL 2880869, at *5.

Page is dissatisfied with this series of treatment decisions and clearly would have preferred to have been treated by an outside orthopedic doctor. However, the record does not indicate that Dr. Obaisi's decisions were a substantial departure from accepted medical judgment. *See Ammons v. Hannula*, No. 08-CV-608-BBC, 2009 WL 799670, at *2 (W.D. Wis. Mar. 24, 2009) (denying motion for preliminary injunction because prisoner's claim that he was entitled to have an orthopedic hand surgeon evaluate his wrist injury did not show a likelihood of success given that nothing suggested that prison doctors' care fell below a minimum standard of competence); *Barnes v. Dews*, No. 1:13CV529-KS-MTP, 2014 WL 691564, at *5 (S.D. Miss. Feb. 21, 2014) (dismissing deliberate indifference claim based on prisoner's belief that his broken finger needed to be rebroken and realigned when the defendant doctor provided ongoing care, ordered a series of x-rays, and recommended range of motion therapy as prisoner's allegations did not support an inference that the doctor refused treatment, intentionally treated him incorrectly, or otherwise wantonly disregarded his serious medical needs).

Similarly, no evidence suggests that this course of treatment was based on anything other than Dr. Obaisi's evolving medical assessment as Page's fractures progressed through the healing process. *See Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 663-64 (7th Cir. 2016) (affirming summary judgment in favor of prison doctor when the prisoner failed to identify evidence showing that the challenged treatment decision was "so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment"); *Holloway*, 700 F.3d at 1073 (rejecting prisoner's argument that prison doctor's choice of pain medication demonstrated deliberate indifference because the prisoner's own doctor recommended a different medication when no evidence suggested that the prison doctor's decision

was a substantial departure from accepted professional standards or was not based on a medical judgment).

Third, Page blames Dr. Obaisi for the scheduling issues with the outside specialist. However, Dr. Obaisi was entitled to "rely on other medical personnel to carry out [his] directives, though []he could not turn a blind eye if it was obvious to [him] that other staff members were not following through on [his] orders." *Norwood v. Ghosh*, — Fed.App'x —, No. 15-2138, 2018 WL 566411, at *6 (7th Cir. Jan. 26, 2018) (citations omitted). Here, Dr. Obaisi did not turn a blind eye as he was aware of initial difficulties scheduling the outside orthopedic visit due to institutional lockdowns. In the meantime, he provided regular medical attention. Time passed, Page's fractures began to knit together, and Dr. Obaisi monitored this process with the input of examinations and x-rays interpreted by Dr. Leef. Dr. Obaisi eventually deemed it appropriate to remove Page's cast and determined that physical therapy would be medically beneficial. While Dr. Obaisi knew that Page had not seen a specialist, he provided a series of appointments and x-rays (which were interpreted by a radiologist) to monitor the fractures as they healed and then ordered a course of physical therapy. This exceeds the constitutional floor of "adequate, minimum-level care." *See Petties*, 836 F.3d at 730.

This is true despite Page's desire to have an outside orthopedic doctor supervise this process, because as noted above, a prisoner may not dictate his own course of treatment. *See Holloway*, 700 F.3d at 1074 (finding that a prison doctor "is free to make his own, independent medical determination as to the necessity of certain treatments or medications, so long as the determination is based on the physician's professional judgment and does not go against accepted professional standards"). Perhaps Dr. Obaisi could have more aggressively pursued an outside

14

appointment immediately after Page's accident, but at best, any such claim would sound in negligence, which is not enough to suggest deliberate indifference. *See Norwood*, 2018 WL 566411, at *6. Thus, Page's arguments about the scheduling snafus are unavailing.

Fourth, Page criticizes Williams and Dr. Obaisi for their response to the shakedown incident when his splint was taken. The record shows that Williams promptly consulted with Dr. Obaisi after she learned about the incident and that Page received an x-ray followed by an appointment with Dr. Obaisi on the following day, when he was recasted. At that time, there was either no displacement or minimal displacement. Neither Williams nor Dr. Obaisi were responsible for the shakedown and the attendant loss of Page's splint, and nothing suggests that their care afterwards was unreasonable. *See Whiting*, 839 F.3d at 663 (affirming grant of doctor's motion for summary judgment when the plaintiff did not "have *any* expert testimony indicating that [the doctor's] infection diagnosis and concomitant treatment plan departed from accepted medical practice, much less *substantially* so") (emphasis in original).

Fifth, Page's vague references to Williams and Dr. Obaisi's purported ongoing refusal to treat pain associated with his fractures are not grounded in the record. Williams prescribed Toradol and Motrin immediate after Page's accident, Dr. Obaisi followed up with more Motrin, Williams refilled Page's Motrin when she was advised that he had run out of medication, and Dr. Obaisi monitored Page's condition with a series of closely timed x-rays and appointments, ordered a new cast when Page's cast was taken, and ultimately approved a course of physical therapy that resulted in substantial improvement. This level of care does not amount to deliberate indifference to Page's purported pain. *See Norwood*, 2018 WL 566411, at *6 (noting that "treating pain allows considerable room for professional judgment. Medical professionals cannot guarantee pain-free

lives for their patients. We do not have specific evidence that P.A. Williams persisted in a course of pain treatment that was obviously inadequate."); *Kyles v. Williams*, 679 F. App'x 497, 499-500 (7th Cir. 2017) (affirming grant of summary judgment in favor of medical technician and physician's assistant Williams because a series of appointments and reasonable medical attention for prisoner's knee issues demonstrated that providers did not consciously disregard a serious risk of harm).

Sixth, Page asserts that the healing process took too long and his fractures did not heal properly. Page appears to be contending that a specialist would have effected an immediate cure (or at least a faster cure). He may not, however, create a material issue of disputed fact by offering his own medical opinions that conflict with those of medical professionals, such as Dr. Leef, the diagnostic radiologist who interpreted Page's x-rays. *See Davis v. Gee*, No. 14-CV-617-WMC, 2017 WL 2880869, at *5 (W.D. Wis. July 6, 2017) (collecting cases rejecting *pro se* prisoners' efforts to self-diagnose in the face of detailed contradictory medical records); *see also Clewis v. California Prison Health Care Servs.*, No. 2:09-CV-2120 JAM AC, 2013 WL 2482521, at *7 (E.D. Cal. June 10, 2013) (prisoner's disagreement with a doctor's characterization of an injury as a "minimally displaced fracture" did not create a fact question as the prisoner was unqualified to interpret the phrase "minimally displaced" or challenge the doctor's diagnosis).

Page's emphasis on Dr. Chen's purported opinion that the fractures did not heal properly does not alter this conclusion. The magistrate judge helped Page obtain copies of his x-rays and arranged for them to be released to Page's sister. *See* Dkt. 48; 55 & 75. Page's sister took the x-rays to Dr. Chen, the outside physician recommended by the emergency room doctors who saw Page immediately after his accident. Dkt. 99, ¶ 28.

In his declaration, Page represents that Dr. Chen told his sister that he had evaluated Page's x-rays and believed that the metacarpals had been "shoved backwards" in a manner that caused "severe permanent damage." *Id.*, Ex. 19, ¶ 42. This is inadmissible double hearsay. *See*, *e.g.*, *Merritte v. Ingram*, 681 F. App'x 512, 515 (7th Cir. 2017) (holding that district court properly excluded prisoner's testimony about what a guard allegedly told the prisoner about the guard's conversation with a nurse). Dr. Chen's written opinion, however, is properly before the Court. *See Boyce v. Wexford Health Sources, Inc.*, No. 15 C 7580, 2017 WL 1436963, at *3 (N.D. Ill. Apr. 24, 2017). Dr. Chen opined that the fractures showed minimal displacement, and records from radiologist Dr. Leef indicate that Dr. Leef believed that the fractures were healing appropriately. Page's personal opinions to the contrary are insufficient to create a triable issue of fact. *See Davis*, 2017 WL 2880869, at *5; *Clewis*, 2013 WL 2482521, at *7.

It is true that Page's physical therapy notes show that the functioning of his injured hand, while significantly improved, was not 100% restored by the time he was released to continue physical therapy on his own. However, no evidence suggests that the treatment Page received, rather than injuries he sustained during his fall, is responsible. *See Norwood*, 2018 WL 566411, at *6 (collecting cases holding that a prisoner opposing summary judgment must point to medical evidence showing that delay in treatment, rather than his own underlying injury, caused "some degree of harm"). In other words, the Constitution guarantees Page treatment within the applicable standard of care, not a specific outcome. *See Forbes v. Edgar*, 112 F.3d 262, 266 (7th Cir. 1997) ("Forbes is seeking a specific treatment and foolproof protection from infection. The Eight Amendment does not provide her with either."); *see also Lewis v. Uy*, No. 2:08-CV-0037, 2010 WL 1236337, at *2 (N.D. Tex. Feb. 12, 2010), report and recommendation adopted, No.

2:08-CV-0037, 2010 WL 1254268 (N.D. Tex. Mar. 31, 2010) (prisoner's desire for alternative care for his shoulder condition because he continued to experience pain did not have constitutional dimension because he did not identify "any legitimate medical protocol which would make him pain free and which was refused" and "not every patient can be healed, *i.e.*, returned to a previous state of near-perfect health and not every patient can be rendered pain-free without addictive drugs"). For all of these reasons, Williams and Dr. Obaisi are entitled to summary judgment.

### B. Wexford

Page asserts that Wexford's policy of making treatment decisions with the goal of saving money caused him to receive constitutionally inadequate treatment. In support, he points to an excerpt from Wexford's Provider Handbook (Dkt. 99, Ex. 17) that indicates that cost is one of many variables considered when treating patients. Evidence showing that cost is one of a group of variables does not show that cost is the preeminent variable.

Moreover, a prisoner's "belief that he received sub-par medical care does not automatically support a *Monell* 'policy or custom' claim." *Barrow v. Wexford Health Sources, Inc.*, No. 3:14-CV-800-NJR-DGW, 2017 WL 784562, at *11 (S.D. Ill. Mar. 1, 2017) (citing *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694 (1978)). Courts have thus declined to accept a prisoner's speculation that his care was dictated by financial considerations, holding that any such position is not based on personal knowledge and is possibly an improper attempt to offer an expert opinion. *Id.* at *5, n.11. This is particularly apt here, given that the record shows—contrary to Page's conclusory assertion that Wexford had a policy of refusing outside care to save money—that Dr. Obaisi referred Page for off-site care eight times, both before and after the hand fracture (specifically, a series of gastroenterologist appointments, video

swallow testing, an esophagogastroduodenoscopy and colonoscopy, esophageal manometry testing, visual field testing, and an esophageal dilation procedure).

Finally, Page asserts that his care does not comport with an Illinois Department of Corrections Administrative Directive regarding offender healthcare services that provides that if a referral is approved, the Medical Director shall ensure that services are scheduled. Dkt. 99, Ex. 20. Any alleged "failure of Wexford to adhere to IDOC directives does not, in and of itself, demonstrate an unconstitutional practice." *Johnson v. Shah*, No. 15-CV-344-SMY-RJD, 2018 WL 724427, at *6 (S.D. Ill. Feb. 6, 2018). With respect to Dr. Obaisi, any alleged violation of "administrative directives and state law, alone, does not violate the Constitution." *Owens v. Allen*, No. 14-CV-00055-JPG, 2014 WL 562655, at *6 (S.D. Ill. Feb. 13, 2014) (citing *Whitman v. Nesic*, 368 F.3d 931, 935 n.1 (7th Cir. 2004)). Thus, any purported failure to follow a state administrative directive is not actionable under § 1983.

For these reasons, Defendants' motion for summary judgment is granted. If Page wants to appeal, he must file a notice of appeal with this Court within thirty days of the entry of judgment. *See* Fed. R. App. P. 4(a)(1). If he appeals, he will be liable for the $505.00 appellate filing fee regardless of the appeal's outcome. *See Evans v. Ill. Dep't of Corr.*, 150 F.3d 810, 812 (7th Cir. 1998). If the appeal is found to be non-meritorious, Page could be assessed a "strike" under 28 U.S.C. § 1915(g). If a prisoner accumulates three "strikes" because three federal cases or appeals have been dismissed as frivolous or malicious, or for failure to state a claim, the prisoner may not file suit in federal court without pre-paying the filing fee unless he is in imminent danger of serious physical injury. *Id.* If Page seeks leave to proceed *in forma pauperis* on appeal, he must file a motion for leave to proceed *in forma pauperis* in this Court. *See* Fed. R. App. P. 24(a)(1). Any such

motion must specify the issues that Page intends to present on appeal. See Fed. R. App. P. 24(a)(1)(C).

## **CONCLUSION**

Defendants' motion for summary judgment [87] is granted. The May 18, 2018 ruling date [104] is stricken. The Clerk is directed to enter final judgment and terminate this case.


Date:  May 15, 2018                                    /s/ Hon. Elaine E. Bucklo
                                                      United States District Judge